LISTON F. HILLS AND CATHERINE F. HILLS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EDWARD G. VOSS AND DOROTHY T. VOSS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4723–77, 4724–77. Filed August 29, 1979.

*H. Stewart Dunn, Jr.,* and *Nora A. Bailey,* for the petitioners.
*Carol K. Scott,* for the respondent.

### OPINION

Wilbur, *Judge:* In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax for the calendar year 1973 in the following amounts:

Docket No. 4723–77 ......... $6,919.45
Docket No. 4724–77 ......... 8,362.15

These deficiencies were based on exclusions from income of reimbursements for moving expenses under section 911[1] in the amounts of $13,507.05 for petitioners Liston F. and Catherine F.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended.

Hills and $13,147.35 for petitioners Edward G. and Dorothy T. Voss.

The issue herein is whether petitioners may exclude from gross income reimbursements paid to them for moving expenses, pursuant to section 911. Section 1.911–1(c)(1), Income Tax Regs., provides, in pertinent part, that amounts received as compensation during the taxable years ending after September 4, 1962, may be excluded from gross income if such amounts are attributed to services performed on or before December 31, 1962, and are received after December 31, 1962, provided that on March 12, 1962, the taxpayer had a "right" to receive such amounts.

These cases were fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Liston F. Hills and Catherine F. Hills, at the time of the filing of their petition herein, were legal residents of Vida, Oreg. For the calendar year 1973, they filed a joint Federal income tax return with the Director of International Operations, Washington, D.C.[2]

Petitioners Edward G. Voss and Dorothy T. Voss, at the time of the filing of their petition herein, were legal residents of Owls Head, Maine. They filed their joint Federal income tax return for the calendar year 1973 with the Director of International Operations, Washington, D.C.[3]

Petitioners claimed exclusions from gross income on their 1973 Federal income tax returns in the amount of $13,507.05 by Hills and $13,147.35 by Voss, which represented reimbursements to them or payments made by the Arabian American Oil Co. (Aramco) for their moving expenses to the United States from Saudi Arabia. Respondent disallowed the exclusions, stating only that reimbursements for moving expenses are not excludable under section 911.

Aramco is engaged in exploration for and recovery of oil in Saudi Arabia. Aramco's headquarters are in Saudi Arabia, which

---

[2]Catherine F. Hills is a party to this action only because she joined in the filing of this return and, accordingly, Liston F. Hills (Hills) will hereinafter be referred to as petitioner.

[3]Dorothy T. Voss is a party to this action only because she joined in the filing of this return and, accordingly, Edward G. Voss (Voss) will hereinafter be referred to as petitioner.

is where substantially all of its operations are located and where its principal officers reside.

Petitioner Hills was an employee of Aramco from 1938 until his retirement in 1973, except for a period of military service from 1941 to 1946. At the time of his retirement, he was chairman of the board of directors. Petitioner Hills, while employed by Aramco these 35 years, resided in Saudi Arabia from 1941 to 1955, and from 1964 to 1973. From 1955 to 1964, petitioner was assigned by Aramco to positions with a wholly owned subsidiary of Aramco in the Netherlands and with a shareholder affiliate of Aramco in Canada, and resided there while being trained for future executive positions with Aramco, which were likely to be in Saudi Arabia. In 1973, petitioner Hills retired from Aramco, and returned to the United States, as did petitioner Voss. Petitioner Voss had been employed by Aramco since 1948. At the time of his retirement, petitioner Voss was treasurer of Aramco, and had resided in Saudi Arabia since 1961.

When the petitioners retired and subsequently returned to the United States, Aramco reimbursed them for, or paid directly on their behalf, their moving expenses. These expenses were as follows:

|  | *Hills* | *Voss* |
| --- | --- | --- |
| Transportation of household and personal property .............. | $11,330.50 | $11,678.80 |
| Travel, meals, and lodging expenses in moving ................. | 2,176.55 | 1,468.55 |
| Total .................................. | 13,507.05 | 13,147.35 |

Aramco's Industrial Relations Manual which was in effect on March 12, 1962, provides in part:

1. GENERAL REGULATIONS. The Company will ship at Company expense from a point not more distant than the employee's point of origin those personal and household effects desired for living in Saudi Arabia, *but limited to personal requirements of employee and his family members*, subject to the limitations and conditions outlined in the following paragraphs. [Emphasis in original.]

1.1 *Shipment Charges.* The Company will absorb fees for packing, shipping, insurance and customs only if shipments are made through approved Company facilities and established ER/ERF procedures. Articles listed in Paragraph 4 will not be processed at Company expense.

1.2 *Items of High Value or Requiring Special Handling.* Items of high value, unusual nature, requiring special type storage (chill, Freeze) or special handling, must be approved for shipment in advance if the Company is

expected to absorb shipping and customs charges. Approval will be granted by the District Head of Residential Services or the New York Personnel Department.

*1.3 *Air Freight or Air Parcel Post Shipments.* The Company will not absorb packing, shipping, customs and insurance charges on such shipments forwarded via commercial airlines except when the shipment is specifically so authorized by the Company, or so routed at the discretion of the Traffic Division. * * *

\*    \*    \*    \*    \*    \*    \*

*3. *WEIGHT ALLOWANCE—UNACCOMPANIED EFFECTS.* No specific weight limitation will apply, except as stated in Paragraph 3.2.3. It is the intent to allow the shipment of a *reasonable* quantity of personal and household effects for normal living requirements. [Emphasis added.]

3.1 *Allowance—Accompanied Effects.* Refer to Chapter XXXI, International Travel.

*3.2 *Shipments from Saudi Arabia.* A *reasonable* quantity of personal/household effects (exclusive of exempt items and articles for resale) may be packed and shipped at Company expense to employee's point of origin, or to a point to which shipping expense does not exceed the expense of shipping to the point of origin. [Emphasis added.]

3.2.1 *Upon Separation from Company Service for any Reason*

3.2.1.1 *Retirees.* Shipments, not to exceed two, may be made for a retiree to any location within the United States. If the retiree establishes a home outside the United States which is more distant than his point of origin, one unlimited shipment of a reasonable quantity of effects may be made at Company expense.

3.2.1.2 *Employee Remaining in Saudi Arabia upon Separation.* If an employee plans to remain in Saudi Arabia following separation from the Company, shipment may be made to his point of origin or to a location within Saudi Arabia. Shipments should be made within one month after separation, and no subsequent shipments will be permitted.

*3.2.1.3 *Storage Fees.* The Company will absorb storage fees up to 30 days, which will include any time required for goods to clear customs. This period may be extended to 90 days for annuitants. Storage other than herein specified will be at personal expense. * * *

\*    \*    \*    \*    \*    \*    \*

4. EXEMPT ITEMS. The Company will not absorb any charges *incidental* to packing, transportation, customs or insurance on the following items: [Emphasis added.]

| | |
|---|---|
| Automobiles, including accessories, equipment and spare parts | Furs and fur coats Jewelry, including |
| Boats and boat kits | watches and costume jewelry |
| Inboard marine engines | Tobacco, food, beverages, candy |
| Motorcycles, motorscooters, motorbikes | Trailer and trailer kits |
| Articles used for business/resale | Garages and garage kits |

Whenever tobacco, food, beverages or candy are included in a personal effects

shipment, the Company will absorb the packing, transportation and insurance charges provided the weight of the item or items does not exceed 25 pounds; when shipment exceeds 25 pounds, the employee will be charged for full weight of item shipped. All customs assessments will be charged to the employee.

The Industrial Relations Manual also provided that Aramco would provide for the insurance coverage in shipping personal and household effects, as well as for payment of custom duties, within specified guidelines.

Also, the manual, in chapter XXX, specifically set forth rules governing the transportation of employees upon termination of employment with Aramco. It provided for transportation with allowance to the point of origin upon termination of an employee "for cause" or upon resignation.[4]

For taxable years ending before September 4, 1962, a citizen of the United States qualifying under section 911[5] was entitled

---

[4]In addition, as of Mar. 12, 1962, Saudi Arabia had in effect labor and workmen regulations, published by the Ministry of Finance, which had been in effect since October 1942. These regulation provided, with respect to obligations of employers to provide transportation of employees upon termination of their employment:

The employer shall be obligated:

(1) At his expense, to return the workman to the place at which the contract was signed or from which he was hired and transported, if the workman requests it, within fifteen days from the day of termination of the contract * * *

[5]Sec. 911, as in effect for the taxable years herein, provided in part as follows:

SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

(c) SPECIAL RULES.—For purposes of computing the amount excludable under subsection (a), the following rules shall apply:

(1) LIMITATIONS ON AMOUNT OF EXCLUSION.—The amount excluded from the gross income of an

to exclude from his gross income all amounts received as earned income (as defined in section 911(b)) from services performed outside the United States provided that he qualified as a bona fide foreign resident (as petitioners herein do) or was present in a foreign country for a certain minimum time period. In the Revenue Act of 1962 (Pub. L. 87–834), Congress imposed certain limitations and restrictions on the amounts that could be excluded under section 911 for services performed after December 31, 1962. In enacting these changes, Congress provided a "grandfather clause" that allowed eligible employees to receive the same Federal tax treatment on certain payments received after December 31, 1962, as they would have received before that date. The grandfather clause applies to subsequently received compensation attributable to services performed on or before December 31, 1962, provided the employees had an *existing right* to receive such amounts before the effective date of the statutory changes, March 12, 1962. Sec. 11(c)(1), Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, 1005–1006.

The regulations which interpret section 11(c)(1) of the Revenue Act of 1962, *supra,* focus particularly on what constitutes a "right" for purposes of the statute. Section 1.911–1(c)(2), Income Tax Regs., provides that the existence, on March 12, 1962, of a right to receive earned income may be established by a contract, agreement, plan, or provision of foreign law. The regulations (sec. 1.911–1(c)(2), Income Tax Regs.) further state that this right must provide its holder with any one of the following:

1. the payment of a fixed amount of compensation for services performed during a term; or

2. the payment of an amount of compensation computed solely by reference to sales, profits, *or other objectively determinable facts;* or

3. the payment of fixed *or determinable amounts which are in the nature of compensation for past services.* [Emphasis added.]

Thus, the issue for our determination is whether any of these tests of the "grandfather clause" of section 11(c)(1) of the

individual under subsection (a) for any taxable year shall not exceed an amount which shall be computed on a daily basis at an annual rate of—

    (A) except as provided in subparagraph (B), $20,000, in the case of an individual who qualifies under subsection (a), or

    (B) $25,000 in the case of an individual who qualifies under subsection (a)(1), but only with respect to that portion of such taxable year occurring after such individual has been a bona fide resident of a foreign country or countries for an uninterrupted period of 3 consecutive years.

Revenue Act of 1962, *supra*, as embodied in section 1.911–1(c)(2), Income Tax Regs., may be applied to petitioners, so that they may exclude under section 911, the moving expense reimbursements received by them in 1973.

Petitioners contend that on March 12, 1962, they had an "existing right," within the meaning and purpose of section 1.911–1(c), Income Tax Regs.,[6] as evidenced by their employment contract (the Industrial Relations Manual) with Aramco, and by Saudi Arabian law, to have their moving expenses paid for by Aramco. They further contend that they meet both the congressionally prescribed date (March 12, 1962) for the determination of the *existence* of the right to be paid an amount "attributable" to pre-1963 services, and also meet the requirements of establishing a "right" by not only the second but also the third tests provided in section 1.911–1(c)(2), Income Tax Regs. Accordingly, they argue, their 1973 moving expense payments relate back, in effect, to the right to reimbursement which they possessed under the contract prior to the enactment of section 911, and thus they may exclude such amounts from earned income for section 911 purposes.

Respondent, on the other hand, asserts that under section 82,[7] reimbursements or payments for moving expenses must be included in gross income. Respondent further asserts that since petitioners used up their full amount of earned income exclusions under section 911 for 1972 and 1973 (the year of the move and the prior year), they must include the full amounts of payments for moving expenses in their gross incomes for 1973.

In the alternative, respondent contends that even if the payments are "attributable to services performed" prior to 1963, petitioners' asserted "right" to have Aramco pay for their moving expenses is not a "right" which meets the proscriptions of section 1.911–1(c)(2), Income Tax Regs., because the amount petitioners received could not be computed, as of March 12, 1962, solely by reference to "objectively determinable facts" (the

---

[6]Petitioners, on brief, refer to sec. 11(c), Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, 1005–1006, rather than to respondent's embodiment of that provision in sec. 1.911–1(c), Income Tax Regs., because they disagree with respondent's interpretation of this regulation, especially in light of example (5) of sec. 1.911–1(c)(4), Income Tax Regs. (Discussed *infra* p. 967.)

[7]SEC. 82. REIMBURSEMENT FOR EXPENSES OF MOVING.

There shall be included in gross income (as compensation for services) any amount received or accrued, directly or indirectly, by an individual as a payment for or reimbursement of expenses of moving from one residence to another residence which is attributable to employment or self-employment.

second of three possible means of establishing a right under section 1.911–1(c)(2), Income Tax Regs.).

This is a case of first impression. Though the issue is a close one, we agree with petitioners. After a close examination of the legislative history and the statute, and especially of section 1.911–1(c)(1)–(4), Income Tax Regs., we feel that the petitioners meet the second test and, even if they do not, we find that they clearly meet the third test as prescribed by the regulations.

Initially, it is important to understand that we are not confronted with any contention by petitioners that payments or reimbursements for moving expenses upon *retirement* are normally excludable from gross income. Rather, they merely contend that since they had the pre-March 12, 1962, right to the payments based on their ongoing employment with, and services to, Aramco, they should be able to rely upon the statute's provisions (essentially a grandfather clause) applying to pre-1963 compensation rights. They acknowledge that had they not had the right to the payments before the effective date of the changes made by the Revenue Act of 1962, they would have included the payments in income under section 82, since they had already used their full statutory exclusion of $20,000 for their 1973 taxable year under section 911.

Petitioners concede that they do not meet the first of the three alternative tests set forth in the regulations. They point out, however, that it is necessary to meet only one, and submit that they meet not only the third test but also the second. On the basis of the second test, they assert that the objectively determinable facts on which such reimbursement is to be made are the actual costs, at the time of termination, of transporting an employee and family members, as well as their personal effects, and contend that "payment of future compensation based on the cost of moving and transportation expenses is certainly as objectively determinable as compensation based on future sales or profits."

Petitioners argue, under the third test provided in the regulations, that if they would have been eligible to retire on January 1, 1963, and had done so and moved back to the United States, they would have been able to exclude the moving expense income by relying on section 1.911–1(c), Income Tax Regs., because (1) on March 12, 1962, they had had the right to payment of moving expense amounts, and (2) the services they

had performed for Aramco before December 31, 1962, under their employment contract, made them eligible for reimbursement. Thus, they reason, the mere factor of intervening years between 1962 and 1973, the year their pre-March 12, 1962, legal right under the contract was exercised, should not cause the result to differ.

Respondent argues that the pre-1963 services theory upon which petitioner relies is expressly contrary to the reasonable and administrable Service position which is contained in situation (4) of Rev. Rul. 75–84, 1975–1 C.B. 236. Respondent there provided that in retirement move cases any reimbursement is attributable to services performed in the year of and in the year preceeding retirement. We do not find this relevant in the instant case, as there is nothing in the legislative history of section 82 which indicates the intention to usurp the special provisions of the 1962 "grandfather clause" under section 911. This clause, specifically section 1.911–1(c)(1), Income Tax Regs., is a fiction in that it allows rights that were in existence before the enactment of the Revenue Act of 1962 to continue to apply *as if* the 1962 limitations on amounts of excludable income had not been enacted, to prevent retroactive changes in contractual rights which were in existence both when the petitioners' employment contract was made and as it was in effect on March 12, 1962. Thus, the petitioners, having performed their legal obligation of services under the contract prior to March 12, 1962 (and continuing through December 31, 1962), were, on March 12, 1962, legally entitled to the rights and benefits provided in the contract and thus meet the third test permitted by the regulations under section 911.

Respondent bases his reading and interpretation of section 1.911–1(c)(2), Income Tax Regs., on a mistaken assumption that the tests therein are based on determinable *amounts as of December 31, 1962*. However, we find nothing that requires the exact *amount* of compensation must be determinable as of December 31, 1962. Section 11(c) of the Revenue Act of 1962 states only as follows:

(c) EFFECTIVE DATES.—

(1) AMENDMENT TO SECTION 911—The amendment made by subsection (a) shall apply to taxable years ending after September 4, 1962, but only with respect to amounts—

(A) received after March 12, 1962, which are attributable to services performed after December 31, 1962, or

(B) received after December 31, 1962, which are attributable to services performed on or before December 31, 1962, unless on March 12, 1962, there existed a right (whether forfeitable or non-forfeitable) to receive such amounts. [1962–3 C.B. 151–152.]

Examples (*1*) through (*4*) of section 1.911–1(c)(4), Income Tax Regs., do not raise the issue of whether "such amounts" must be determinable as of December 31, 1962. However, it is clear that in example (*5*) there was no way, as of March 12, 1962, of determining the *amounts* which would ultimately pass to the taxpayer under either the "objectively determinable facts" test or the "fixed or determinable amounts in the nature of compensation for past services" test. Example (*5*) of section 1.911–1(c)(4) is as follows:

*Example (5).* B, a United States citizen who files his returns for the calendar year using a cash receipts and disbursements method of accounting is privately employed and a bona fide resident of Spain from January 1, 1953, through December 31, 1972, the entire period of service to his employer. B is compensated at a rate of $30,000 per year for the years 1953 through 1957, $40,000 per year for the years 1958 through 1962, $50,000 per year for the years 1963 through 1967, and $60,000 per year for the years 1968 through 1972. B retires on December 31, 1972, and commences participation in his employer's pension program. The pension plan is embodied in a written document, is in existence on March 12, 1962, and unchanged after that date. B will receive $3,000 per month for life and the amounts will be paid out of his employer's current funds. *B's pension is computed with reference to the amounts of salary set forth above.* B's total compensation with respect to which his pension is computed is $900,000 and the amount of such compensation attributable to foreign services performed before January 1, 1963, is $350,000. The amount of B's pension attributable to foreign services performed before January 1, 1963, and excludable from his gross income for his taxable year 1973 and for taxable years thereafter is $14,000 (350/900 of $36,000). [Emphasis added.]

In example (*5*) of section 1.911–1(c)(4), Income Tax Regs., it could not be determined, as of December 31, 1962, when or even if the taxpayer would retire, or how much he would receive on retirement, and thus the taxpayer's ultimate pension amount could only be computed after the salaries for each of the post–1962 years were known as well. These "variables" are at least as great as those in the instant case, and thus we find that under respondent's own regulations, there is no requirement that the exact amount be determinable as of the statute's effective date, March 12, 1962.

Respondent contends that "the agreement to reimburse petitioners is totally dependent upon subsequently occurring

personal (nonobjective) factors, such as the number of family members to be moved, and the origin and destination of the move." However, we note that Aramco's Industrial Relations Manual provided for payment of moving only a "reasonable" amount of household goods and personal effects necessary only for *family* members, which does have a reasonable and ascertainable limit. Though it is true that in 1962 it could not be foretold what the cost of airline tickets or overseas shipping would be, it is obvious that, as of 1973, a reasonable charge for a passenger's airline ticket, or cost per pound of shipping, may be ascertained. Petitioners contend that respondent is interpreting the regulation requirements too stringently. We find that under the circumstances of the instant case, the employment contract (the Manual) sufficiently provided for "determinable" facts or amounts to compute the amounts of moving expenses in 1973,[8] and that this is all that is required under the statute and regulations.

Finally, both respondent and petitioners rely heavily on Rev. Rul. 72–279, 1972–1 C.B. 218. Petitioners assert that like example (5) of section 1.911–1(c)(4), Income Tax Regs., discussed above, the ruling shows that the *amounts* of compensation need not have been determinable in 1962. The relevant facts of Rev. Rul. 72–279 are as follows:

> The taxpayer, a United States citizen, has been a bona fide resident of Mexico since July 1, 1950, and has been employed by a Mexican corporation since that date. On May 1, 1961, the taxpayer entered into a labor contract with his employer which provided, in part, that he would have the right to retire after 20 years to continuous service and to receive a retirement payment in a single sum calculated, in general, *on the basis of 20 days of salary for each year of service rendered.* The contract further provided that, after completing 20 years of service, the taxpayer could elect as of the eligibility date, to continue in the corporation's employment and still receive an "advance retirement payment" calculated in the same manner as if he had retired. The corporation paid the full amount of the retirement payment to the taxpayer in 1970.
>
> On July 1, 1970, the taxpayer made an election to continue in the corporation's employment and to receive the advance retirement payment. Part of the advance retirement payment received by the taxpayer in 1970 was attributable to services performed prior to December 31, 1962.
>
> [Emphasis added.]

---

[8]The contract not only explicitly provides that the shipment will be limited to personal requirements of the employee and his family members (including household effects), and that the weight allowance will be only for a *reasonable* quantity of personal and household effects, but it also specifically excludes the from coverage costs of shipping some items.

The Service analyzed the law as follows:

Section 1.911–1(a) of the regulations provides that *amounts constituting earned income, as defined in section 911(b) of the Code,* received from sources outside the United States by a citizen of the United States who has been a bona fide resident of a foreign country for an uninterrupted period which includes an entire taxable year *are excludable from gross income if such amounts are not paid by the United States* or any agency or instrumentality thereof, *and if such amounts are attributable to the uninterrupted period. This rule applies to amounts received after December 31, 1962, under a right which existed on March 12, 1962, and which are attributable to services performed on or before December 31, 1962.* [Rev. Rul. 72–279, *supra,* 1972–1 C.B. at 218; emphasis added.][9]

Unfortunately, the ruling does not make it clear whether the "20 days of salary for each year of service" will be based on the taxpayer's salary in the year the service was rendered, salary in the year of the taxpayer's retirement, or on some average for the years immediately preceding retirement, though in many, if not most, retirement plans of the type here, the pay is based on salary in the year of retirement. Making this assumption here, our reasoning here is the same as for example (5) of section 1.911–1(c)(4), Income Tax Regs. It could not be determined as of March 12, 1962, exactly *what* amount the taxpayer would have been entitled to receive.[10]

The final issue for consideration is whether there is some basis for treating "compensation," within the meaning of section 911–1(c)(2), Income Tax Regs., in the form of moving expenses, as in the instant case, differently from compensation in the form of retirement payment under section 1.911–1(c)(4), example (5), Income Tax Regs. Though there have been changes in the treatment of moving expenses and reimbursements since March 12, 1962 (secs. 82 and 217), moving expenses, at the time the 1962 statute was passed, were clearly within the meaning of compensation for earned income purposes. We find that the fact that moving expenses are not, as of 1979, "attributable" to an employee's *total* years of service is not dispositive of the issue

---

[9]While revenue rulings are not necessarily controlling (see *Sandor v. Commissioner,* 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976), and *Estate of Lang v. Commissioner,* 64 T.C. 404 (1975), they serve as an appropriate vehicle for discussion of the positions taken by the parties. .

[10]See Rev. Rul. 79–6, 1979–1 I.R.B. 15. While the ruling itself is adverse to the taxpayer, it is clear that if the taxpayer had had a right as of Mar. 12, 1962, to severance pay on *involuntary* termination, the ruling would have allowed severance pay relating to *both* pre- and post-Mar. 12, 1962, service to qualify for treatment under sec. 1.911–1(c), Income Tax Regs. Respondent specifically noted, however, that the severance pay received was a "determinable amount," to which the taxpayer simply had not shown a *right.*

herein. If petitioners had retired on January 1, 1963, the moving expense reimbursements would have been excludable, based on their past service (pre-1963) to Aramco, on the basis of their contract rights, as provided in the grandfather clause of section 911. The mere passage of years since Congress gave this "carryover" exclusion to pre-March 12, 1962, rights should not affect petitioners' right to rely on the statute's provisions.

*Decisions will be entered for the petitioners.*