EUGENE C. McGRATH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McGrath v. Commissioner
Docket No. 3880-82.
United States Tax Court
T.C. Memo 1987-139; 1987 Tax Ct. Memo LEXIS 133; 53 T.C.M. (CCH) 363; T.C.M. (RIA) 87139; March 16, 1987. *133 P was a resident of the Republic of Panama whose earned income was from sources outside the United States. On January 15, 1962, the company employing P executed a contract with P offering him a special reimbursement for services he performed during the period from January 1, 1949, to December 31, 1961, inclusive, to be paid in installments over a period of years. The amounts due to P from the special reimbursement were not paid in cash but were credited to him against a loan account he had with the company. In 1968 dissident shareholders took over the company and terminated P's employment there. At that time the company still owed P $330,000 from the special reimbursement. A dispute arose concerning the balance in P's loan account with the company. In fact, the balance due from P's loan account was less than the amount owed to him by the company in 1968. In 1973 P and the company entered into a settlement agreement dropping all claims against each other. Held, the amounts credited to P's loan account pursuant to the 1973 settlement were exempt income under sec. 911, I.R.C. 1954. Bruce I. Hochman and Charles P. Rettig, for the petitioner. Karl D. Zufelt, for the respondent. *135 NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency in petitioner's income tax for the taxable year 1973 in the amount of $190,407. After concessions, the issues for decision in this case are (1) whether petitioner realized income by reason of a discharge of indebtedness in 1973 and (2) whether the statute of limitations bars the assessment and collection of tax in this case. FINDINGS OF FACT Some of the facts in this case have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner, a United States citizen, was a resident of the Republic of Panama at all times relevant to this case. Petitioner filed United States Federal income tax returns for the taxable years 1962 through 1968, inclusive, and for the taxable year 1973. Petitioner was the founder and one of the original directors of the Panama Insurance Company (Compania Panamania de Seguros, S.A., hereinafter referred to as the Company). The Company began its operations in 1949. During his employment with the Company, petitioner held various titles, but his responsibilities were *136 primarily those of managing director and chief operating officer of the Company. The Company began its operations with two employees and a minimal amount of annual premiums and grew to become one of the largest insurance companies in the Republic of Panama with approximately 140 employees. From 1950 until 1957 petitioner's salary from the Company was $1,100 per month, plus 5 percent of the Company's profits. During that time, petitioner paid for all his business expenses. In 1957 petitioner executed an employment agreement with the Company, for the five-year period beginning July 1, 1957. Under the terms of the agreement, petitioner received $2,200 per month plus 10 percent of the Company's annual net profit. The $2,200 included a monthly salary of $600 plus $1,600 for reimbursement of business expenses. The agreement also provided petitioner with a loan of $175,000 from the Company to purchase 6,500 shares of Company stock. The 1957 employment agreement between petitioner and the Company was superseded by a new employment agreement dated December 15, 1961. The new agreement increased petitioner's remuneration to $3,000 per month to cover petitioner's salary and reasonable *137 expenses. The new agreement also provided stock options in petitioner's favor and extended the time for repayment of the amounts previously loaned to petitioner for purchasing Company stock. On January 15, 1962, petitioner and the Company executed an "Annex to Employment Agreement" (hereinafter referred to as the Annex). The Annex provided that petitioner was to be paid, in March, 1962, 10 percent of the Company's profit for 1961. This document also provided for a "special reimbursement:" 2.- The Board of Directors of the Company has indicated a willingness to grant a special reimbursement to McGrath over and above his salaries and bonuses received or earned from January 1, 1949 to December 31, 1961. This special reimbursement would compensate McGrath for his efforts in the guiding of the Company through its thirteen years of growth, and in particular in connection with the salvage of the multimillion dollar INEMSA loss as threatened the Company. It is agreed that this special reimbursement to McGrath is payable by the Company recognizing to McGrath an indebtedness, effective immediately, in the amount of Six Hundred Thousand Dollars ($600,000), payable to McGrath over the *138 period of the next eleven years on either one of the two alternatives spelled out hereafter, with the understanding that said alternative is to be selected by McGrath within thirty days of his acceptance of this annex to the Employment Contract: Alternative "A": McGrath may elect to receive the $600,000 by a payment of $100,000 prior to December 31, 1963, and $50,000 each year during the ten successive years beginning in 1964 and terminating in 1973. Or, Alternative "B": McGrath may agree to accept ten percent (10%) of the net profits of the Company for the ten operating years of 1962 to 1971, inclusive, in lieu of the "lump sum" payment of $600,000. In the event that McGrath selects this alternative the Company and McGrath agree that, should the ten percent of the profits over the ten operating years be less than $600,000, then the 10% of the annual net profit shall be payable to McGrath until the Company has paid to McGrath the sum total of the $600,000 indebtedness which is recognized as a credit to McGrath effective this date. Alternatively, should the 10% of the profit for the ten operating years from 1962 to 1971, inclusive, total more than $600,000, McGrath shall *139 be entitled to receive the full amount as is payable from that 10% of the profits annually despite the fact that it shall be more than $600,000. * * * The intent of the foregoing two paragraphs is embodied in the Company's desire to see McGrath (as the highest executive of the Company) granted a further initiative, over and above the $600,000 lump sum payment as is recognized to McGrath as a special reimbursement. Further, the Company recognizes that, should McGrath select alternative "B," McGrath may probably require longer than ten years to be paid the $600,000, and should therefore be entitled to receive more than the $600,000 in order to compensate for the length of time required for said payout. 3.- It is specifically agreed that no interest is payable to McGrath on this $600,000 credit. 4.- It is specifically agreed by McGrath that the payment to him of $600,000 (or the 10% of the profits from January 1, 1962 to December 31, 1971) is accepted by McGrath in full payment to him for all services rendered by McGrath for the period of January 1, 1949 to December 31, 1961 inclusive. 5.- It is specifically agreed that in the event of the death of McGrath prior to December 31, 1973, the *140 payments of Alternatives 2-A or 2-B, as selected by McGrath hereafter, shall continue to be paid to his estate until the full amount of the payment involved by that alternative shall have been paid. Petitioner elected Alternative "B" of the Annex. Petitioner was not paid in cash from the special reimbursement. Instead, payments under the special reimbursement were credited to petitioner's officer's loan account, a running account of personal expenditures the Company paid on petitioner's behalf. Through 1967 petitioner was credited a total of $270,000 pursuant to the special reimbursement resulting in a balance due petitioner in 1968 in the amount of $330,000. Petitioner reported each of the payments from the special reimbursement on his United States Federal income tax returns in the year of receipt. In 1968 and 1969, petitioner received the remaining balance of the special reimbursement in the amount of $330,000 as a credit to his officer's loan account. Petitioner reported $360,000 [1] from the special reimbursement as exempt income on his 1968 United States Federal income tax return. *141 All the services performed by petitioner on behalf of the Company were performed in the Republic of Panama or in countries outside the United States. All the income received by petitioner from the Company was income from sources outside the United States. On each of petitioner's United States Federal income tax returns for the years 1962 through and including 1968, petitioner reported income received from the Company, claimed to have been exempt under the provisions of sections 1.911-1(c)(1) and 1.911-2(a), Income Tax Regs.[2]
Between 1963 and 1968 the Company incurred significant losses with respect to bonds held in an entity known as INEMSA. In 1968, the minority shareholders of the Company held several meetings (general and special), designed, in part, to remove petitioner from his office as president of the Company. The dissident shareholders caused the termination of petitioner's employment in 1968. From August, 1968, until 1972, petitioner received no income, property or other assets from the Company. Under Panamanian law, the minutes of *142 shareholders' and directors' meetings of Panamanian corporations must be protocolized (registered) with the Director of Public Registry in the Republic of Panama to have legal and binding effect. In 1968 the by-laws of the Company required that more than one-half of the total of 114,594 shares of issued and outstanding stock of the Company be represented to constitute a quorum for the transaction of business at shareholder meetings. Only 47,608 shares were represented at the Company's shareholder meetings in 1968. Accordingly, in 1968 petitioner initiated litigation seeking to declare as void the actions taken by the minority shareholders at the meetings and to return petitioner to his position as president of the Company. Petitioner was successful in obtaining an order dated December 5, 1972, from the Third Circuit Court of Panama instructing the Director General of the Public Registry to annul the registration of the contested minutes. The minority shareholders appealed the order through the Panamanian court system. While this litigation was pending, the minority shareholders attributed various expenditures of the Company to petitioner's officer's loan account. On August 31, 1968, the *143 minority shareholders contended that petitioner was indebted to the Company in the amount of $728,349.86. On or about November 19, 1968, in an attempt to prevent collection activities by the Company, petitioner signed a document entitled "Acknowledgment of Debt with Collateral" (hereinafter referred to as the Acknowledgment) in favor of the Company in the amount of $172,860.88. Notwithstanding the execution of the Acknowledgment, the dispute between petitioner and the Company concerning the exact amount of the obligation continued. The attorney representing petitioner in that dispute continued to object to the inclusion of certain amounts in the petitioner's obligation to the Company. On January 13, 1969, the comptroller of the Company issued a statement to petitioner indicating that petitioner's obligation to the Company was $502,860.88 less $330,000 (representing the remaining balance due from the Company to petitioner under the 1961 Employment Agreement, as amended), resulting in a total balance due to the Company of $172,860.88. By letter dated July 23, 1981, the Company conceded that $241,129.27 of the $502,860.88 originally charged against petitioner was improper. On *144 March 27, 1973, petitioner and the Company signed a settlement agreement whereby each party abandoned all claims against the other. On his 1973 Federal income tax return, petitioner reported $502,000 as income from his settlement with the Company and claimed that this amount was exempt under section 1.911-1(c)(1), Income Tax Regs. The return also stated that petitioner disagreed with the $502,000 valuation of the settlement. OPINION In 1973 the balance in petitioner's officer's account was $261,731.61 ($502,860.88 originally claimed by the Company, less charges of $241,129.27 conceded by the Company to have been improper). Respondent takes the position that this amount was income to petitioner in 1973 as a discharge of indebtedness under section 61(a)(12). Petitioner maintains that in 1973 the Company owed him $330,000 of the special reimbursement and that the settlement relieved the Company of its debt to him in the amount of $68,268.39. Petitioner argues that none of the $330,000 owed to him from the special reimbursement was income to him because it was exempt under section 911[3] and section 1.911-1(c), Income Tax Regs.
*145 Before 1962 section 911 provided an unlimited exemption from tax on earned income, from sources outside the United States, attributable to services performed by a bona fide foreign resident. In 1962 section 911 was amended to limit the exemption to $35,000 per qualifying individual per year, and to deny exemption of amounts received after the close of the taxable year following the year in which services were rendered. Section 11(a), Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960. In 1964 Congress reduced the $35,000 for taxable years beginning after December 31, 1964. Section 237, Revenue Act of 1964, Pub. L. 88-272, 1003-1006, 78 Stat. 19, 128. However, the unlimited exemption was retained for amounts received after December 31, 1962, attributable to services performed before that date if an "existing right" to such amounts existed on March 12, 1962. Section 11(c)(1), Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, 1005-1006; Hills v. Commissioner,72 T.C. 958, 963 (1979). The regulations interpreting section 11(c)(1) of the Revenue Act of 1962, supra, focus particularly on what constitutes a "right" for purposes of the statute. Section 1.911-1(c)(1) *146 and (2), Income Tax Regs., T.D. 6665, 1963-2 C.B. 27, 33, provided: (c) Applicability of section -- (1) In general. The rules contained in this section apply only to amounts received -- (i) During taxable years ending on or before September 4, 1962, or (ii) During taxable years ending after September 4, 1962, but only if such amounts are attributable to services performed -- (a) On or before December 31, 1962, and are received -- (1) On or before December 31, 1962, or (2) After December 31, 1962, but only if on March 12, 1962, there existed a right described in subparagraph (2) of this paragraph to receive such amounts, or (b) After December 31, 1962, but only if such amounts are received on or before March 12, 1962. (2) Rule of application. A right referred to in subparagraph (1)(ii)(a)(2) of this paragraph shall be considered to exist on March 12, 1962, if such right (whether forfeitable or nonforfeitable) is embodied in a contract, agreement, plan, or provision of foreign law in force on March 12, 1962, which provides for the payment of a fixed amount of compensation for services performed during a term, for the payment of an amount of compensation *147 computed solely by reference to sales, profits, or other objectively determinable facts, or for the payment of fixed or determinable amounts which are in the nature of compensation for past services. The existence as of March 12, 1962, of such a contract, agreement, plan or provision of foreign law embodying such a right may be established by -- (i) Written evidence; (ii) Evidence of a trade custom governing the method of payment of persons performing the same type of services; (iii) Evidence of an oral agreement between the person performing services and the person for whom such services are performed as to the method of computing compensation for such services; or (iv) Evidence of the provision of foreign law. Petitioner argues that the Annex constitutes written evidence of petitioner's right as of March 12, 1962, to receive a special reimbursement of $600,000 for services performed before December 31, 1962, and that the special reimbursement is exempt income. Respondent takes the position that the purpose of the Annex was not to reimburse petitioner for his former services, but to assure that petitioner would continue to work for the Company in future years. Respondent *148 argues that the Annex therefore compensated petitioner for services performed after December 31, 1962, and is not exempt income. We disagree. The evidence shows that the special reimbursement was for services performed by petitioner before December 31, 1962, and was not compensation for petitioner's future employment with the Company. On its face the Annex states that the amounts due to petitioner were for services performed by petitioner for the period of January 1, 1949, to December 31, 1961, inclusive. The payment of the special reimbursement was not dependent on petitioner's continued employment with the Company. The Annex provided that in the event of petitioner's death before 1973, the remaining payments due would continue to be paid to his estate. Finally, the Company at all times recognized its obligation to pay petitioner the $330,000 remaining balance due from the special reimbursement even though petitioner had ceased working for the Company in 1968. Respondent argues, however, that we should disregard the Annex because it is an illusory contract based on inadequate consideration. Panama Civil Code, section III, Article 1126 (1973) provides: "Contracts without consideration, *149 or for illegal consideration, have no effect. * * *" Under common law in the United States, past consideration is insufficient to support a contract. 17 C.J.S. Contracts, section 116 (1963). Respondent maintains that the Annex is void because it created an obligation for the Company to pay petitioner for his prior services. According to the parties' stipulations, however, Panama's Civil Code encompasses a broader definition of consideration than American common law. The parties have stipulated that Panama Civil Code section III, Article 1125 (1973) provides: With respect to burdensome contracts, consideration for each contracting party is the lending or promise of a thing or a service to the other party; in remunerative contracts, it is the service or benefit conferred; and in contracts of pure beneficience [sic], the mere generosity of the benefactor. Even if the Annex was a contract of pure beneficence, the payment of special reimbursement was enforceable under Panamanian law. The Company recognized this and did not seek to avoid its obligation to petitioner by declaring the Annex void for want of consideration. Petitioner also argues that he reported the $330,000 *150 remainder due from the special reimbursement on his 1968 Federal income tax return and that the statute of limitations bars the assessment and collection of taxes on any amount attributable to the special reimbursement. The only year at issue in this case, however, is 1973, for which year petitioner has alleged no limitation barring assessment. Nevertheless, because we have already held that any income received as a result of petitioner's settlement with the Company was exempt, we need not address the statute of limitations issue. Decision will be entered for the petitioner.
Footnotes
1. Petitioner states that his reporting of $360,000 rather than $330,000 as exempt income from the special reimbursement was due to an accounting error.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue.↩
3. Section 911, as in effect for the taxable year in issue, provided in part as follows: SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (a) GENERAL RULE. -- The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: (1) BONA FIDE RESIDENT OF FOREIGN COUNTRY. -- In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c). * * * (b) DEFINITION OF EARNED INCOME. -- For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. (c) SPECIAL RULES. -- For purposes of computing the amount excludable under subsection (a), the following rules shall apply: (1) LIMITATIONS ON AMOUNT OF EXCLUSION. -- The amount excluded from the gross income of an individual under subsection (a) for any taxable year shall not exceed an amount which shall be computed on a daily basis at an annual rate of -- (A) except as provided in subparagraph (B), $20,000 in the case of an individual who qualifies under subsection (a), or (B) $25,000 in the case of an individual who qualifies under subsection (a)(1), but only with respect to that portion of such taxable year occurring after such individual has been a bona fide resident of a foreign country or countries for an uninterrupted period of 3 consecutive years. (2) ATTRIBUTION TO YEAR IN WHICH SERVICES ARE PERFORMED. -- For purposes of applying paragraph (1), amounts received shall be considered received in the taxable year in which the services to which the amounts are attributable are performed.↩